Cydney CRUE, et al., Plaintiffs,

v.

Michael AIKEN, Defendant.

Case No. 01–1144.

United States District Court,
C.D. Illinois.

May 24, 2002.

Harvey Grossman, Jane M. Whicher, Lauren B. Raphael, Adam Schwartz, Barbara O'Toole, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for Plaintiff.

William J. Brinkmann, Michael R. Cornyn, Thomas, Mamer & Haughey, Champaign, IL, for Defendant.

## ORDER

MIHM, District Judge.

This matter is now before the Court on cross-motions for summary judgment. For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment [# 71] is GRANTED, and Defendant's Motion for Summary Judgment [# 69] is DENIED.

## I. JURISDICTION

The jurisdiction of the Court arises pursuant to 28 U.S.C. § 1331, as the matter presents a case or controversy arising under the First Amendment to the U.S. Constitution.

## II. BACKGROUND

For many years, the University of Illinois (the "University") has used Chief Illiniwek as a symbol for its sports teams. A student assumes the role of Chief Illiniwek by wearing clothing identifiable in popular culture as that worn by Native Americans and performs a dance while so costumed at major athletic events such as football and basketball games.

Plaintiffs are students and faculty members at the University who publicly oppose the use of the Chief Illiniwek mascot as creating a hostile environment for Native American students, promoting the acceptance of inaccurate information in an educational setting, increasing the difficulty of recruiting Native American students, and contributing to the development of cultural biases and stereotypes. They have in the past expressed their opposition to Chief Illiniwek through public speaking in various forums, writing letters, meeting with student groups, submitting newspaper articles for publication, and attending protests, and the University has made no attempt to interfere with such efforts. In late February 2001, Plaintiffs expressed an interest in contacting prospective student athletes to communicate their concerns and inform them about the Chief Illiniwek controversy.

Defendant, Michael Aiken ("Chancellor Aiken"), is the former Chancellor of the University. As part of his duties as Chancellor, he was responsible for ensuring that the University was in compliance with the rules of the National Collegiate Athletic Association ("NCAA"). The NCAA, through its member institutions, governs participation in inter-collegiate athletics and regulates the extent and timing of contacts with prospective student athletes by University staff, coaches, faculty, and athletic representatives. Failure to abide by NCAA regulations can lead to sanctions being imposed upon the University, its athletic programs, and loss of eligibility for prospective student athletes.

On March 2, 2001, Chancellor Aiken sent an email message to all faculty, staff, and students at the University which stated in relevant part:

Questions and concerns have been raised recently about potential contacts by employees, students or others associated with the University with student athletes who are being recruited by the University of Illinois. As a member of the National Collegiate Athletics Association (NCAA) and the Big Ten Athletic Conference, there are a number of rules with which all persons associated with the University must comply. For example, the NCAA regulates the timing, nature and frequency of contacts between any University employee and prospective athletes. It is the responsibility of

the coaches and administration in the Division of Intercollegiate Athletics to recruit the best student athletes to participate in varsity sports at the University of Illinois. No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee.

The University faces potentially serious sanctions for violation of NCAA or Big Ten rules. All members of the University community are expected to abide by these rules, and certainly any intentional violations will not be condoned. It is the responsibility of each member of the University to ensure that all students, employees and others associated with the University conduct themselves in a sportsmanlike manner. Questions about the rules should be addressed to Mr. Vince Ille, Assistant Director for Compliance, Bielfeldt Athletic Administration Building, 1700 S. Fourth Street, Champaign, IL 61820, (217) 333–5731, E-mail: ille@uiuc.edu.

(hereinafter referred to as the "Preclearance Directive.") On the same date, after the receipt of this email, Plaintiff Professor Fred Hoxie ("Professor Hoxie") sent a follow-up email to the Chancellor indicating his desire to inform prospective students about the University's perceived unwillingness to respond to the concerns of Native Americans with respect to the Chief Illiniwek controversy and seeking guidance about how the Preclearance Directive impacted him. Nearly two weeks later, Professor Hoxie received a response from Vince Ille ("Mr. Ille"), Assistant Athletic Director for Compliance, indicating that the NCAA rules, and therefore the Preclearance Directive, apply in four situations:

[I]f the prospective students contacted are identified for contact based upon their participation in athletics, if the contact is made for the purpose of addressing any issue related to athletics, if the contact is made for the purpose of addressing the prospective student's possible participation in intercollegiate athletics, or if the contact is made at the request of a Division of Intercollegiate Athletics staff member.... We are committed as an institution to operating our intercollegiate athletics program in compliance with the rules and regulations of the NCAA. This means that we expect members of the University community to respect NCAA rules, and certainly not to intentionally violate them.

Professor Hoxie replied that he did not intend to discuss the athletic program with prospective student athletes, but still did not understand how he could communicate his concerns regarding the racial atmosphere on campus to them under the Preclearance Directive. On March 20, 2001, Mr. Ille again responded with the list of four situations in which the NCAA rules purportedly apply to regulate contact with prospective students.

On March 19, 2001, Chancellor Aiken addressed the faculty senate, reading from a written statement which essentially reiterated the statements contained in Mr. Ille's March 20, 2001, email to Professor Hoxie. His statement also included a comment to the effect that he had received emails posing a series of hypothetical questions about the First Amendment and that engaging in a debate about such matters would not seem helpful or productive. The entire text of the Chancellor's statement was as follows:

The University values and defends the principles of free speech and academic freedom for members of the University community.

The University does not seek to interfere with the expression of views regarding matters of public concern.

However, we also are a member of the NCAA, and are committed to controlling our intercollegiate athletics program in compliance with the rules and regulations of the NCAA.

This means that we expect members of the University community to respect NCAA rules, and certainly not intentionally violate them.

As explained in my e-mail of March 2, there are numerous and detailed NCAA rules regarding contacts by faculty and other University representatives with prospective student athletes. The NCAA Division I Manual itself is 480 pages long. That is why my e-mail advised that any such contacts should occur only with the express authorization of the Director of Athletics or his designee, who have experience in these issues. This is the same policy that this campus consistently has followed in regulating contacts with prospective student-athletes.

I have sought advice from the DIA compliance officer, Vince Ille, and Legal Counsel on this issue. Mr. Ille also consulted with the NCAA.

We expect members of the University community to express their viewpoints without violating NCAA rules concerning contacts with prospective student-athletes. Numerous such opportunities abound, including letters to the editor, press releases, radio/TV interviews leafleting, and public speeches. Various faculty members and others have availed themselves of these opportunities over the years.

Let me address one other point: we have received some e-mails in response to my March 2 e-mail that pose a series of hypothetical questions about the First Amendment and other issues. Engaging in a debate at this time about such matters hardly seems helpful or productive.

On June 5, 2001, following the entry of a Temporary Restraining Order by this Court, then Chancellor Aiken issued an e-mail to all faculty, staff, and students at University that stated:

As you may recall, on March 2, 2001, I sent an e-mail message to persons associated with the University regarding "Contact with Potential Student Athletes." My email message stated, in part, that: "No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee." However, in light of Judge Mihm's order of April 6, 2001 and more recent testimony by representatives of the National Collegiate Athletic Association (NCAA), I have concluded that express authorization of the Director of Athletics or his designee should not be required. Therefore, effective this date, I am permanently retracting the above-quoted sentence of my March 2, 2001 e-mail message.

The retraction of the above-quoted language from my earlier e-mail does not lessen the University's commitment to complying with NCAA rules in the recruitment of student athletes at the University of Illinois. I continue to call upon all members of the University community to abide by the rules of the NCAA when dealing with potential student athletes. Should you have questions concerning NCAA rules, please contact Mr. Vince Ille, Assistant Director for Compliance, at the Division of Intercollegiate Athletics. Thank you.

Following various rulings by the Court, including the dissolution of that Temporary Restraining Order as moot and the partial granting of a motion to dismiss, what remains of this case is Plaintiffs' request for declaratory judgment that the Preclearance Directive violated their First Amendment rights and the claim of certain of the Plaintiffs for related damages. Both Plaintiffs and Defendant Aiken have moved for summary judgment. The matter is now fully briefed and ready for resolution. This Order follows.

### III. LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

### IV. DISCUSSION

The question now before the Court is whether Plaintiffs are entitled to a declaratory judgment that Chancellor Aiken violated their First Amendment rights in issuing the Preclearance Directive. Specifically, they contend that the Preclearance Directive constituted an unconstitutional prior restraint on speech, as it banned all speech directed toward prospective student athletes without prior permission from the Director of Athletics or his designee. The elements of a prior restraint are: (1) the speaker must apply to the decisionmaker before engaging in the proposed communication; (2) the decisionmaker is empowered to determine whether the applicant should be granted permission based on his/her review of the proposed content of the communication; (3) approval of the request requires affirmative action by the decisionmaker; and (4) approval is not a matter of routine, but involves the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the decisionmaker. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 554, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), *citing Cantwell v. Connecticut,* 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

■ Chancellor Aiken now argues that the ban did not prohibit speech toward all prospective student athletes, but rather only those prospective student athletes being recruited by the University. Although the subject of actual recruitment is noted in the beginning of the text of the email, the proposed limitation on audience suggested by Defendant is not contained in the plain language of the restriction itself, which provides only that "No contacts are permitted with prospective student athletes, including high school and junior college students, by University students, employees or others associated with the University without express authorization of the Director of Athletics or his designee." Nor is the argued limitation referenced in the subsequent communications from either the Chancellor or Mr. Ille which referred to contacts with prospective student athletes without limitation according to their recruitment status. Even the media announcements which immediately preceded the Chancellor's email do not indicate an intent to target prospective student athletes *being recruited by the University,* as opposed to prospective student athletes in general. Accordingly, the post-hoc suggestion that the directive did not apply unless the prospective student athlete was being actively recruited by the University is without merit.[1]

■ The Chancellor contends that his email was a content-neutral time, place, and manner restriction. Specifically, he asserts that it gave notice to the entire University community rather than just employees, indicates that the NCAA rules will govern, and is narrowly tailored to apply to the only class of students governed by NCAA rules. A regulation is content-neutral if it is "justified without reference to the content of the regulated speech." *Gresham v. Peterson,* 225 F.3d 899, 905 (7th Cir.2000), *citing Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Additionally, "regulations of the time, place, and manner of expression which are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication" may be enforced. *Id., citing Perry Educ. Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

While the Chancellor's ban might at first blush appear to be content neutral as it purported to apply to all speech, the fact that the directive applied only to the audience of prospective student athletes [2] and was subsequently clarified by Mr. Ille to apply to at least two classes of purely content-based speech, that being (1) speech for the purpose of addressing any issue related to athletics and (2) speech for the purpose of addressing the prospective student's possible participation in intercollegiate athletics, indicates that the ban was in fact content-based, as it unquestionably imposed a substantial burden on a particular type of expressive activity. Moreover,

---

1. Parenthetically, the Court notes that even if Defendant's characterization was meritorious, it would be a distinction of little substance as the Preclearance Directive would still constitute a content-based prior restraint on speech. The attempted distinction is an effort to indicate the reasonableness of the Chancellor's belief that NCAA rules could be violated or to otherwise justify his actions, neither of which are particularly probative on this precise inquiry as failure to comply with NCAA rules and the possibility of sanctions cannot reasonably be equated to a "great and certain" evil or the type of most exceptional circumstances necessary to justify a prior restraint of this magnitude.

2. The Court has already rejected the suggestion that the ban on its face was limited to prohibit contacts with only those prospective student athletes being recruited by the University.

the timing and text of the Preclearance Directive itself indicate that it was implemented primarily in response to media rumors that certain students and faculty wanted to begin contacting prospective student athletes for purposes of discussing the Chief Illiniwek controversy, from which a reasonable juror could infer University hostility toward the subject matter of the proposed speech or that the University adopted the regulation because of its disagreement with the message Plaintiffs intended to convey. *See Gresham,* 225 F.3d at 905, *citing Ward,* 491 U.S. at 791, 109 S.Ct. 2746.

Despite the best efforts of the Chancellor to rephrase or recharacterize the content of the Preclearance Directive, the text on its face prohibits all contacts with all prospective student athletes at any time without prior authorization from the University without any express limitation on the location, manner, or subject matter of the proposed contacts. Even in Mr. Ille's clarifying comments, the directive was represented to apply for the purpose of addressing any issue related to athletics or if the contact is made for the purpose of addressing the prospective student's possible participation in intercollegiate athletics, both of which are much broader than the scope of communications actually implicated by the NCAA rules, which focus on contacts related to recruiting.

The University suggests that the Preclearance Directive set out a policy that limited the discretion of the Director of Athletics. However, the Court notes the following: (1) the email does not expressly indicate that proposed communications will be evaluated against the NCAA's manner, timing, and frequency regulations; (2) the email targeted and restricted a broader class of speakers than those to whom the NCAA rules could reasonably be applied; (3) Mr. Ille has testified that in reviewing any proposed contact, he would specifically inquire into what exactly was going to be discussed during the contact before making any decision; and (4)Mr. Ille's subsequent clarifications reveal that the suggested limitation on discretion is somewhat illusory, as he proceeded to announce restrictions and applications based on his subjective interpretations that were not supported by the plain language of the NCAA rules or his communications with NCAA staff.

■ Even assuming that the lesser standard applied to a time, place, and manner restriction could be applicable here, the Chancellor's directive would still not pass muster. While the University may have a legitimate interest in maintaining compliance with NCAA rules or avoiding disruption to its athletics mission, the Preclearance Directive was not narrowly tailored to achieve such a purpose and burdened substantially more speech than was necessary to further that interest. *See Turner Broadcasting System, Inc. v. Federal Communications Commission,* 520 U.S. 180, 186, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). This is the antithesis of a constitutionally valid time, place, and manner restriction.

To the contrary, the Preclearance Directive chilled potential speech instead of punishing speech after it occurred, required the members of the University community to request permission from the Director of Athletics or his designee prior to making any proposed communications, empowered the Director of Athletics with authority to make a subjective decision based on the content of the message, required affirmative approval by the decisionmaker, and unquestionably involved the "appraisal of facts, the exercise of judgment, and the formation of opinion" by the decisionmaker based on his interpretation of NCAA rules, all of which are classic indices of a prior restraint. Accordingly,

Defendant's argument that the Preclearance Directive was a content-neutral time, place, or manner restriction rather than a prior restraint is both incorrect as a matter of law and unavailing.

A. *Plaintiffs Crue, McKinn, and Reese*

■ Initially, Defendant argues that Plaintiff Crue should not be classified as a student, but rather as a faculty member as a result of the fact that she held a position as a teaching assistant at the time in question. In support of this assertion, the Chancellor submits the affidavit of Barbara Hartman ("Hartman"), an Associate Director in the University's Department of Human Resources. Hartman indicates that during the spring semester of 2001, Crue was a graduate student, as well as an employee of the University serving as a graduate teaching assistant and being paid for that service. However, Plaintiffs respond that the University should be judicially estopped from attempting to classify teaching assistants as employees as a result of a contrary position taken in other litigation. In *Graduate Employees Organization, IFT/AFT, AFL–CIO v. Illinois Educational Labor Relations Board*, 315 Ill.App.3d 278, 248 Ill.Dec. 84, 733 N.E.2d 759 (1st Dist.2000), the issue addressed was whether teaching assistants, graduate assistants, and research assistants at the University were "educational employees" or students. *Id.*, 733 N.E.2d at 761. The record demonstrated that these assistants had to be enrolled as students and did not receive a salary, but rather financial aid in the form of a monthly stipend and waiver of tuition and fees as compensation. *Id.* at 762. While the University's position is not frivolous, the Court cannot find on the record before it that a graduate student who accepts financial aid in the form of a stipend and in return performs certain duties as a graduate assistant has forfeited all of her rights as a student and become an employee in the same class as part-time faculty members who are not also students. Her claims will therefore be discussed in conjunction with those of McKinn and Reese.

■ It is well-established that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *CBS v. Davis*, 510 U.S. 1315, 114 S.Ct. 912, 914, 127 L.Ed.2d 358 (1994). While the presumption against prior restraints "is by no means absolute, the gagging of publication has been considered acceptable only in 'exceptional cases.' " *Id., citing Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). As the Supreme Court recognized in *Davis:*

> Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remed[y]" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.

114 S.Ct. at 914.

Here, the Preclearance Directive on its face banned speech that cannot be classified as "recruitment" under the plain language of NCAA Bylaw 13.02.11, which defines recruiting as:

> [A]ny solicitation of a prospect or a prospect's relatives or legal guardian(s) by an institutional staff member or by a representative of the institution's athletics interests *for the purpose of securing the prospect's enrollment and ultimate participation in the institution's intercollegiate athletics program.*

(emphasis added). The Preclearance Directive also banned speech by students who were neither employed by nor acting at the behest of either the University or the Department of Athletics and who did not meet the definition of a "representative

of the University's athletic interests" as defined in NCAA Bylaw 13.02.12.

A "representative of the institution's athletics interests" is an individual, independent agency, corporate entity (e.g., apparel or equipment manufacturer) or other organization who is known (or who should have been known) by a member of the institution's executive or athletics administration to: (a) Have participated in or to be a member or an agency or organization promoting the institution's inter-collegiate athletics program; (b) Have made financial contributions to the athletics department or to an athletics booster organization of that institution; (c) Be assisting or to have been requested (by the athletics department staff) to assist in the recruitment of prospects; (d) Be assisting or to have assisted in providing benefits to enrolled student-athletes or their families; or (e) Have been involved otherwise in promoting the institution's athletics program.

NCAA Bylaw 13.02.12.

As set forth above, the Preclearance Directive clearly constituted a content based prior restraint on speech as a matter of law. The University's purported justification for the application of the Preclearance Directive to students not affiliated with the athletics department (i.e., the purchase of tickets to an athletics event) strains the spirit and context of the applicable NCAA rules beyond the breaking point, particularly as the NCAA's prohibitions are couched in terms of regulating the fairness of *recruitment* by individuals acting on behalf of the University and/or its athletics program, and the only express reference to a prohibition on contacts made by students not affiliated with the Department of Athletics merely prohibits contacts by such students "at the direction of a coaching staff member" or contacts which are "financed by the institution or a representative of its athletics interests." NCAA Bylaw 13.1.3.5.2.

Moreover, even the written opinion from Delise O'Meally ("Ms. O'Meally"), Membership Services Coordinator at the NCAA, upon which the Defendant relied for the proposition that the NCAA rules govern the situation presented in this case and are binding on the University, does not support the application of the Preclearance Directive to students who do not represent the athletic interest of the University and who do not intend to recruit prospective student athletes. To the contrary, while Mr. Ille's initial email to Ms. O'Meally expressly included six hypothetical situations involving contacts by faculty, staff, or students at the University, Ms. O'Meally's response referred only to contacts by an "institution" or an "institutional staff member." This omission indicates that Ms. O'Meally was not adopting the portion of Mr. Ille's hypotheticals that related to contacts by students who did not otherwise meet the definitions under the NCAA Bylaws. Furthermore, Ms. O'Meally subsequently clarified in her deposition that students are generally not covered by the rules unless they meet the definition of booster or representative of an institution's athletic interests, neither of which are the case here. (O'Meally Dep. at 52)

Defendant nevertheless argues that it was the Chancellor's duty to ensure that contacts with athletes met NCAA rules to avoid subjecting the University to sanctions for such violations and adds that the University had been subject to sanctions for lack of institutional control in the past. While this may be a legitimate and important interest, it simply does not rise to the level of the type of "exceptional" circumstance that would justify an outright ban on the speech of students who are not even generally covered by the rules the Chancellor claimed to be upholding. Nor is it a situation presenting a great and certain evil that could not be militated by less

intrusive means under which prior restraints have previously been upheld. There has been no evidence of any situation in which similarly situated students have caused harm to the University's interests by contacting prospective student athletes to provide information on matters of public concern that bear only the most tangential relationship to the athletics program, or for that matter that the University has any concrete basis to presume that such communications would actually result in the feared harm. In fact, it is undisputed that subsequent clarifications from the NCAA have revealed: (1) the purchase of season tickets to athletic events in and of itself would not cause a student to come within the NCAA regulations; (2) no penalty would be imposed on a prospective student athlete if a professor sent him the communications produced by Plaintiffs; (3) if the University was either unaware of Plaintiffs' correspondence or acted reasonably to stop it, no penalty would be imposed on the University; and (4) it is "unlikely" that the NCAA would impose any penalty if Plaintiffs presented their proposed correspondence in a telephone call or in-person contact with a prospective student athlete. Although the NCAA's position on the contacts proposed by Plaintiffs was not known to the Chancellor at the time he acted, this is in part because the University did not make any real attempt to obtain a binding opinion prior to issuing the directive. That being said, the fact that the NCAA does not interpret its rules as broadly as the University and would not have found much, if any, of the proposed condut to be sanctionable does shed some light on the reasonableness of the Chancellor's actions.

With respect to the student Plaintiffs, the measures taken by the University plainly went beyond a narrowly-tailored attempt to further a legitimate interest (compliance with the NCAA rules and regulations and the University's interest in protecting high school students from "undue pressure") and resulted in a prohibition and chilling of protected speech that violated the First Amendment of the United States Constitution. Accordingly, as no reasonable jury could find in favor of Defendant on the record before the Court, the Court finds that the student Plaintiffs are entitled to a declaratory judgment in their favor.

### B. *Faculty Members*

It is also established that individuals do not forfeit their First Amendment rights merely by virtue of the fact that they accept employment with a governmental unit or agency. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). However, it is equally well-settled that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. NTEU*, 513 U.S. 454, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995). In evaluating the constitutional propriety of a restraint on government employee speech, courts must attempt to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 88 S.Ct. at 1734–35.

Here, the University again argues that the Preclearance Directive was a content neutral time, place, and manner restriction, which generally passes constitutional muster so long as it: "(1) [is] justified without reference to the content of the regulated speech; (2)[is] narrowly tailored to serve a significant governmental interest; and (3) leave[s] open ample alternative channels for communication of

the information." *DiMa Corp. v. Town of Hallie,* 185 F.3d 823, 828 (7th Cir. 1999). Although it cannot be disputed that multiple alternative channels of communication (e.g., news conferences, letters to the editor, etc.) are and have always been available to the faculty Plaintiffs, they nevertheless contend that the Preclearance Directive is really a content-based prior restraint to which the higher standard set forth in *NTEU* applies. Where a ban "chills potential speech before it happens ... the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 115 S.Ct. at 1014.

Again, as set forth in the prior section of this Order, the Preclearance Directive bans all speech directed toward prospective student athletes without prior permission from the Director of Athletics or his designee and has been clarified by Mr. Ille to apply to two classes of purely content-based speech, indicating that the ban imposes a significant burden on a particular type of expressive activity and is at least to some degree content-based. *See Id.* It also seems clear that the directive "chills potential speech instead of merely punishing actual speech already communicated" and imposes a "blanket policy designed to restrict expression by a large number of potential speakers." *Milwaukee Police Assn. v. Jones,* 192 F.3d 742, 750 (7th Cir.1999); *Harman v. City of New York,* 140 F.3d 111, 118 (2nd Cir.1998). Thus, it operated as a prior restraint with respect to the faculty Plaintiffs, even under the Seventh Circuit's most recent pronouncements in *MacDonald v. City of Chicago,* 243 F.3d 1021 (7th Cir.2001), and *Thomas v. Chicago Park District,* 227 F.3d 921 (7th Cir.2000), as the directive on its face reduced a certain type of speech, vested

considerable discretion with the Director of Athletics or his designee as the reviewing body by authorizing subjective judgment about the content of any proposed speech or other expressive activity directed toward student athletes, placed no time constraints upon the review process that would prevent the proposed commentary from becoming moot by delay, referred to no appeals process, and presented a substantial likelihood of self-censorship by eliminating the possibility of anonymous speech that could discourage potential speakers from coming forward. Thus, under the guidance of *Milwaukee Police Assn.* and *Harman,* the Court respectfully disagrees with the University and finds the higher *NTEU* standard to be applicable to the present situation.

 It is undisputed that the Chief Illiniwek controversy presents a matter of public concern and that the faculty Plaintiffs, as citizens, have an interest in being able to communicate on the topic. However, that does not mean that the University cannot impose any restraint on speech. What remains, then, is the question of whether the University's stated interests are significant enough to outweigh the free speech interests of these Plaintiffs.

 The University's asserted interests are complying with its obligations as part of the NCAA, including rules regulating recruitment contact with prospective student athletes, furthering its athletics mission, and protecting the educational and privacy interests of prospective student athletes. This is again based on the University's perception that the proposed communications with student athletes by faculty members would run afoul of the NCAA regulations, which is in part based on the written opinion from Ms. O'Meally indicating:

> [I]f an institution either identifies and contacts a group of prospective students

based on their athletics ability or contacts prospective students to discuss their athletics participation those contacts are subject to NCAA regulations. Therefore ... if an institutional staff member makes a telephone contact, an in-person off-campus contact or sends written correspondence to a prospective student to discuss his or her athletics ability or possible participation in inter-collegiate athletics such contacts would be considered recruiting contacts and would be subject to NCAA regulations. Further, if an institutional staff member makes a telephone contact, an in-person contact or sends written correspondence to prospective students who have been identified based on their athletics ability such contacts would also be considered recruiting contacts regardless of the content of the message and thus would also be subject to NCAA regulations.

Ms. O'Meally's Affidavit, upon which Defendant also relies, states:

> In my experience, most contacts between member institutions and prospective student athletes are designed to recruit or induce the student athlete to attend the particular member institution, but the NCAA rules and regulations are not limited to contacts that can be demonstrated to be designed to induce attendance. As indicated above, the rules and regulations are designed in part to shield student athletes from undue pressures, regardless of the source. See Manual at 2.11. While it is of course unusual that member staff or faculty would seek to discourage student athletes from attending their own institution, the NCAA contact rules and regulations referenced above have equal application to such a situation, and under the principle of Institutional Control and Responsibility, the member institution is responsible for compliance by all its staff.

NCAA Bylaw 13.01.5 states: "Representatives of an institution's athletics interests (as defined in Bylaw 13.02.12) are prohibited from making in-person, on- or off-campus recruiting contacts, or written or telephonic communications with a prospect or the prospect's relatives or legal guardians." A representative of athletic interests is defined as previously set forth in this Order in NCAA Bylaw 13.02.12. Recruiting is further defined as "any solicitation of a prospect or a prospect's relatives [or legal guardian(s)] by an institutional staff member or by a representative of the institution's athletics interests for the purpose of securing the prospect's enrollment and ultimate participation in the institution's inter-collegiate athletics program." NCAA Bylaw 13.012.11.

The plain language and content of these rules and regulations are focused on regulating the conduct of those individuals who are acting on behalf of the University's athletic interests with respect to matters related to the recruitment of student-athletes, which parenthetically is defined under the regulations as "a student who has started classes for the ninth grade." NCAA Bylaw 13.02.10. The NCAA rules do not directly, or by reasonable inference, address the present situation, where a matter of public concern (i.e., alleged racial stereotyping or insensitivity) is only tangentially related to athletics. In fact, as the Court has previously concluded, it is clear from the record that the creators of the NCAA rules and regulations never anticipated the application of those rules and regulations to the present type of controversy. The Court questions whether the plain language of the NCAA Bylaws as written even apply in this case, as it has not been sufficiently established that faculty Plaintiffs qualify as "representatives" of the University's athletic interests or that the nature of the proposed contacts could

in any reasonable way be deemed "recruiting." [3]

Ms. O'Meally also indicated in her written opinion, which was not received by the University until six days after the Chancellor issued the Preclearance Directive, that the rules were enacted, in part, to shield student athletes from undue pressures that might interfere with their scholastic or athletics interests. However, there has been no showing or attempt to show that the type of contacts proposed or made by the Plaintiffs came anywhere close to constituting undue pressure on prospective student athletes.

Furthermore, while Mr. Ille testified that Ms. O'Meally's written opinion on the application of the rules to his six hypothetical situations would have the binding effect of a written bylaw, the Court has not been presented with or referred to any written rule indicating that this is the case. The testimony was that that conclusion results from discussions at various NCAA conferences and the fact that last year a proposed rules change providing that such written opinions are not binding was not approved. Moreover, Ms. O'Meally was not at that time presented with the specific factual situation at issue in this case and did not appear to base her written opinion on the question of whether speech on the issue of the purported racial insensitivity and stereotyping posed by the use of Chief Illiniwek would run afoul of the NCAA Bylaws. Under the specific definitions contained in the relied-upon sections of the Bylaws, the Court also questions whether any interpretation finding such provisions directly applicable to the set of facts before it could be deemed objectively reasonable.

Nevertheless, even assuming that the NCAA Bylaws and written opinion apply to the present situation, the University's position continues to ignore the question of whether an individual's First Amendment right to engage in expressive speech under these circumstances can be arbitrarily trumped by the University's reliance on the rules and regulations of a private organization, particularly where the spirit and the goals espoused by that organization have no substantial relationship to the nature of the expressive conduct being prohibited, and the purported harm is speculative at best.

 The faculty Plaintiffs cite to *NTEU* and its progeny for the proposition that "where the government singles out expressive activity for special regulation to address anticipated harms, the government must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" *Harman*, 140 F.3d at 121. This point is well taken, as there has been no evidence of harm to date. In fact, the record that has been compiled since the initial hearing in this matter has only confirmed that the likelihood of any sanction or discipline against either prospective student athletes or the University is virtually non-existent under the circumstances present here. The University has not even been able to offer any evidence of so-called

---

**3.** Although the University argues that if after reviewing the content of a proposed contact, Mr. Ille determined that the NCAA rules did not apply, permission for the contact would likely have been granted. However, this side argument ignores the import of the fact that the very requirement of preclearance imposed an absolute ban on expression for an indefinite period of time that may or may not have been alleviated by receiving the subsequent blessing of the Department of Athletics and likely chilled potential speakers from ever seeking approval for communications they might otherwise have made for fear of retaliation. The University continues to ignore the fact that the very requirement of obtaining preapproval of speech on an issue of public concern could result in constitutional injury.

horror stories where similar acts of expression by similarly situated individuals have resulted in harm to an NCAA member institution or a detriment to its legitimate interests regarding its relationship with the NCAA. Thus, on the record before the Court, the University has failed to sufficiently justify its conduct under the standard set forth in *NTEU* and *Harman*.

This Court is well aware of the important and necessary role that the NCAA plays in the regulation of intercollegiate sports. It is also not difficult to see that the University community would be substantially harmed if the NCAA found that, because of a rules violation, the athletics program at the University or a prospective student athlete should be sanctioned. Nonetheless, the law simply does not support the University's seemingly blind reliance on its interpretation and extension of the NCAA Bylaws as justification for its conduct in issuing the Preclearance Directive. Whatever the scope of the harm that could reasonably and legitimately have been perceived at the time, the University could not set out to avoid such harm by abdicating its independent responsibility to determine whether an NCAA rules interpretation was consistent with the First Amendment rights of its students and faculty and instead delegate that responsibility to the NCAA. As the Court has previously indicated, the corresponding duties resulting from the University's voluntary decision to be a member of the NCAA cannot mean that the University has a right or obligation to check the First Amendment rights of its students and faculty at the property line of the campus. In the context of this case, the University could not summarily establish a checkpoint through which every student, faculty member, or staff wanting to contact any high school student in the ninth grade or above must receive prior approval even if the matter to be discussed was one of public concern and not related to re-cruitment, and it would seem to the Court that the NCAA could not reasonably expect any member institution to go so far as to unconstitutionally chill or ban the speech of students and faculty on such topics. Accordingly, the Court concludes that the faculty Plaintiffs are also entitled to a declaratory judgment in their favor.

■ Parenthetically, the Court notes that even if the facts justified the application of a lesser standard of scrutiny, the ruling would remain the same. The Chancellor argues that the University has determined that compliance with the NCAA regulations is important to the mission of its athletics department and that unregulated conduct between its employees and athletic recruits is harmful to that mission. The Chancellor also concedes that the Plaintiffs' proposed speech involves a matter of public concern that vests them with an important interest as well but then argues that any attempt by Plaintiffs to discourage a prospective student's attendance at the University would be a disruption of the University's goals and mission.

Although under a lesser standard of scrutiny this case presents a much closer question, the Court would nevertheless conclude that the Preclearance Directive imposed a blanket prohibition on the speech of all faculty, students, and staff at the University that placed a greater burden on the faculty Plaintiffs than justified by the perceived threat of harm that allegedly motivated its enactment. Moreover, under the facts of this case, the nexus between the University's legitimate interests and Plaintiffs' proposed speech was too tenuous to support the breadth of the ban imposed.

There has been no showing that prospective students either have been or will likely be disrupted in their educational pursuits or subjected to undue pressure by virtue of the limited contacts at issue in this case. Nor has there been any show-

ing that the NCAA would find that the University had not met its obligations in exercising institutional control and impose penalties. Again, on this record, the scope of the presumed threat to the University's sports program is insufficient to justify the summary forfeiture of the University community's right to engage in speech on a matter of public concern that is only tangentially related to their employment or the University's athletics program. While it might have been possible for the Chancellor to have crafted a more narrowly tailored and direct restriction that could have passed constitutional muster, that was not done here and merits no additional discussion.

## 2. OVERBREADTH

▮ Plaintiffs also argue that the Preclearance Directive as written was fatally overbroad, as it applied to all students/faculty/university employees without regard to the fact that the nature of their purported message was unrelated to athletic recruiting as defined in the NCAA rules. The Court agrees.

A restriction on speech has been found to be unconstitutionally overbroad where there is "a likelihood that the statute's very existence will inhibit free expression [because it necessarily] inhibits the speech of third parties who are not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799–800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). On its face, the Preclearance Directive was unlimited with respect to time and place, and the Court has previously found that it clearly implied a threatened punishment for violation, although the precise nature of the sanction was unspecified.

According to the testimony of Chancellor Aiken and Mr. Ille, the University must sometimes act proactively to prevent clear violations of the NCAA Bylaws which it has reason to anticipate. The Court rec-

ognized the validity of this assertion under certain circumstances as exemplified by the appropriate and narrowly-tailored distribution of the pamphlet entitled "An NCAA Rules and Regulations Guide," which is routinely distributed to boosters and other supporters of the athletic program, as well as others who could meet the definition of a "representative" of the University's athletics interests under the NCAA Bylaws. This pamphlet provides the information necessary to alert these individuals as to what conduct on their part may cause the University to be noncompliant with its obligations to the NCAA, but then leaves it up to these individuals to exercise good judgment and act accordingly. Such is not the case with the broad preemptive ban on speech that was imposed by the Preclearance Directive, which failed to limit itself to restricting no more speech than was reasonably necessary to protect the University's interests and unnecessarily reached a substantial amount of constitutionally protected conduct, seemingly without any regard for whether the proposed expression reasonably posed a threat to the University's legitimate interests. *See City of Houston, Texas v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987); *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1440 (D.C.Cir.1996).

## 3. QUALIFIED IMMUNITY

▮ In ruling on a Motion to Dismiss earlier in this case, the University raised the issue of qualified immunity. At that time, the Court concluded that Plaintiffs had adequately alleged a violation of their constitutional rights and that their right to be free from such a violation was clearly established at the time of Chancellor Aiken's actions; Defendant's assertion of qualified immunity was therefore rejected. In the present motion, Defendant again argues that Chancellor Aiken is entitled to qualified immunity. However, nothing has

changed in the case that would justify a different result. In fact, the only substantive change is that the Court has now ruled as a matter of law that the Preclearance Directive violated the constitutional rights of the Plaintiffs, which only strengthens the conclusion that qualified immunity is not appropriate. Nevertheless, in the interest of a complete record, the Court will reiterate its basis for finding that Chancellor Aiken is not entitled to qualified immunity.

 In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court enunciated the "modern standard to be applied in qualified immunity cases." *Auriemma v. Rice,* 895 F.2d 338, 341 (7th Cir.1990). The Court stated:

> Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. The test for qualified immunity is "whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted." *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir.1987). In deciding whether a defendant will enjoy qualified immunity, courts must determine: "(1) whether the plaintiff has asserted a violation of a federal right, and (2) whether the constitutional standards implicated were clearly established at the time in question." *Eversole v. Steele,* 59 F.3d 710, 717 (7th Cir.1995), *citing Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994). The first issue is a threshold one. If the plaintiff fails to state a violation of a federal right, then the plaintiff's claim fails altogether and the court need not go on to decide whether the law was clearly established at the time of the offense. *See*

*Marshall v. Allen,* 984 F.2d 787, 793 (7th Cir.1993); *Zorzi v. County of Putnam,* 30 F.3d 885, 892 (7th Cir.1994); *Eversole,* 59 F.3d at 717. In outlining the approach a court must take in addressing qualified immunity, the Seventh Circuit has advised:

> Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

*Landstrom v. Ill. Dept. of Children & Family Serv.,* 892 F.2d 670, 675 (7th Cir. 1990), *quoting Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Based on the record before the Court, Plaintiffs have established that the Preclearance Directive operated as a prior restraint in violation of their First Amendment right to freedom of speech. The question then becomes whether their right to be free from such a restriction was clearly established on March 2, 2001. The Court notes that long before Chancellor Aiken issued his Preclearance Directive, the Supreme Court had held that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Davis,* 114 S.Ct. at 914; *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). In fact, it was equally well-established that prior restraints, often referred to as a "most extraordinary remed[y]", have been upheld "only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." *Davis,* 114 S.Ct. at 914.

In *Gay Lib v. University of Missouri,* 558 F.2d 848, 857 (8th Cir.1977), the Eight

Circuit looked toward Supreme Court precedent and noted that "it is axiomatic that the First Amendment must flourish as much in the academic setting as anywhere else. To invoke censorship in an academic environment is hardly the recognition of a healthy democratic society." (Internal citations omitted.) The court then found that "the restriction of First Amendment rights in the present context may be justified only by a far greater showing of a likelihood of imminent lawless action than that presented here." *Id.* at 854. This standard has also been phrased as a prohibition against interference with the right of free expression unless that expression "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *University of Southern Mississippi Chapter of the Mississippi Civil Liberties Union v. University of Southern Mississippi,* 452 F.2d 564, 565 (5th Cir.1971), *citing Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).[4]

Here, the University has made no showing that the proposed speech presented a likelihood of imminent lawless action or that the speech would have materially and substantially interfered with the requirements of appropriate discipline in the operation of the University. To the contrary, all that has been demonstrated is the subjective belief of certain University officials that the proposed speech might subject the University to some sort of sanction by the NCAA or interfere with its efforts to recruit the best student athletes into its program. This is plainly insufficient to justify the broad prior restraint on speech imposed by the Preclearance Di-rective under the precedent cited above, and it should have been apparent to a reasonable school official that enforcing the Preclearance Directive against Plaintiffs would violate their constitutional rights. Accordingly, Chancellor Aiken is not entitled to qualified immunity.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment [# 71] is GRANTED, and Defendant's Motion for Summary Judgment [# 69] is DENIED. The only issues remaining for trial are the limited damages claims of Plaintiffs Crue, Farnell, Hoxie, Kaufman, and Phillips. This matter remains set for final pretrial conference on June 5, 2002, at 1:00 p.m. in person in Peoria.

---

4. The court in the *University of Southern Mississippi* case also noted that the University's reliance on "unfounded prognostication of future conduct" or "vaguely predictive, miscon-duct" rather than evidence of actual misconduct was insufficient to justify curtailment of constitutionally favored expression. 452 F.2d at 567.