In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3117

Cynthia Taylor and Rebecca Smith,

Plaintiffs-Appellants,

v.

Hamilton Carmouche, Margaret Felton,
and City of Gary, Indiana,

Defendants-Appellees.

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:96 cv 504--Andrew P. Rodovich, Magistrate Judge.

Argued February 22, 2000--Decided May 24, 2000


  Before Coffey, Easterbrook, and Williams, Circuit
Judges.

  Easterbrook, Circuit Judge.  After Hamilton
Carmouche was promoted to Corporation Counsel of
Gary, Indiana, he needed to appoint a City
Attorney, the No. 2 position. He chose Margaret
Felton, which caused an uproar among the
secretaries in the office. It was not just that
Felton is white, while Carmouche, most of the
other attorneys and staff, and most residents of
Gary are black. The problem was that people
thought that Felton would be a taskmaster--as she
turned out to be (for example, she had a time
clock installed). The next year was filled with
strife: staff members complained to Carmouche and
went over his head when he backed Felton.
Displeased with efforts to undermine his position
and that of his chosen second in command,
Carmouche disciplined several of the insurgents.
By the end of that year our two plaintiffs--
Cynthia Taylor, a lawyer in the office, and
Rebecca Smith, a secretary and paralegal--were
gone. Soon Carmouche and Felton followed them to
private life, as they had lost the confidence of
Mayor Barnes. He, too, was replaced before much
longer, having decided not to run for reelection
in 1995.
  Taylor was hired in June 1993, fresh from law
school, and last worked for the Law Department in
October 1994, when she took maternity leave. When
Taylor sought to return in December, Carmouche
demanded a medical clearance in light of Taylor's
contention that she needed therapy three days a

week to address her inability to climb stairs--a serious problem at the Law Department, located on the fourth floor of a building whose elevator does not go higher than the third floor. Taylor did not respond for a month, and the physician's opinion she finally secured in January said that she could not climb stairs or work more than four hours a day. Carmouche told Taylor that she would be welcome to come back when she could work full time; instead she found other employment and sued for wrongful discharge, contending that Carmouche retaliated against her on account of her complaints about his (and Felton's) stewardship of the Law Department. Claims under the Americans with Disabilities Act, the Family Medical Leave Act, and Title VII of the Civil Rights Act of 1964 have dropped by the wayside. In this court Taylor's sole contention, based on 42 U.S.C. sec.1983, is that Carmouche violated her rights under the first amendment by penalizing her for speech about matters of public concern.

Smith joined the Law Department in 1991 and was satisfied with her situation until February 1994, when Felton became City Attorney. Smith complained in general terms to both Carmouche and Mayor Barnes that Felton is a "racist," and Smith perceives that she suffered as a result. Felton issued Smith a written warning for taking too much time for lunch and complained in writing to Carmouche about Smith's unwillingness to attend a professional seminar. Felton delivered a verbal warning for using profanity and failing to treat others with respect. In July Felton spoiled a surprise birthday party that Smith and other secretaries had planned for a co-worker, telling the object of the party to "call off the dogs." When Smith paged Carmouche to return to the office so that she could complain in writing about Felton's reference to the secretaries as "dogs," Carmouche blew up and called Smith's memo "a piece of shit" and handed her a written order (dated ten days earlier) suspending her for failing to provide certain documents to the City Council in a timely fashion. Smith appealed this suspension to the City's personnel committee, where both she and Taylor testified that Smith was being singled out for alleging that Felton is a racist. Smith prevailed on this grievance but soon was suspended again, and her additional grievances were unsuccessful. (She does not contend in this litigation that any of the additional suspensions was unjustified. Nor does she complain about the multiple written warnings for tardiness and insubordination that were placed in her file before Felton's appointment.) Smith quit in October 1994 and labels this a constructive discharge.

Carmouche was not pleased by Smith's decision

to go over his head, or by Taylor's criticism of his management decisions, and let both of them know it. Taylor, who had been working in a detached office on the third floor (large enough for one attorney and one secretary) to accommodate her leg injury, was ordered back to the fourth floor for closer supervision. She appealed to Gary's chief operating officer, who told her to stay put. Taylor then went home and was not present for a visit from Carmouche and Felton, who suspended her for abandoning her job. Taylor filed another grievance, sought medical leave for the period of the suspension, and also applied for maternity leave. When Felton initially granted a shorter period of leave than Taylor sought, she filed a grievance about that decision too, this time with the City's personnel director. Taylor returned to work and filed a workers' compensation claim, asserting that all time off had been attributable to an injury sustained on the job, and filed yet another grievance, this time asserting retaliation for testifying at Smith's grievance hearing. For the first time, Taylor went outside the City's personnel hierarchy; she turned to the United States Department of Labor, asserting in a letter that she was the victim not only of retaliation for speech but also of racial discrimination. Meanwhile Taylor commenced her maternity leave, which was to last until mid-December. Taylor reported back to work on December 19, and her answer to Carmouche's question whether she was able to work full time led to his request for a physician's evaluation--and what happened then we have already described.

Magistrate Judge Rodovich, presiding by consent under 28 U.S.C. sec.636(c), granted judgment as a matter of law to the City of Gary on the first amendment claims at the close of plaintiffs' case. Municipalities are not vicariously liable in litigation under sec.1983. Monell v. New York Department of Social Services, 436 U.S. 658 (1978). That Carmouche was a department head does not affect application of the Monell principle. Auriemma v. Rice, 957 F.2d 397 (7th Cir. 1992). Unless the City had a policy of retaliating against protected speech--and neither Taylor nor Smith contends this--it cannot be liable. If Carmouche or Felton retaliated against protected speech, then they violated rather than implemented Gary's personnel policy, so the sec.1983 claim against the City was rightly dismissed.

Evidence concerning plaintiffs' remaining claims showed that Felton alienated the secretaries by insisting that they work harder, that the secretaries perceived her as condescending, and that Carmouche was touchy, insensitive, profane,

and in many other respects a poor manager. None of these is a federal offense, however, and the magistrate judge concluded that Smith, at least, had nothing else to go on. After plaintiffs' case the magistrate judge granted judgment as a matter of law against Smith (and in substantial measure against Taylor), ruling that none of the events within the City's chain of command was speech protected by the first amendment against retaliation. All of the statements, protests, and grievances were internal personnel matters, dealing with the situations of the plaintiffs rather than matters of general public concern, the magistrate judge concluded. See Connick v. Myers, 461 U.S. 138 (1983); Waters v. Churchill, 511 U.S. 661 (1994). The letter to the Department of Labor, however, was not an internal affair, and retaliation against Taylor for writing this letter could support recovery, the court stated. The jury returned a verdict in Taylor's favor against Carmouche on this theory, awarding a total of $80,000 in damages: $14,000 for lost wages and benefits, $6,000 for other loss, and $60,000 as punitive damages. On all other theories of liability (for example, Title VII and the FMLA), the jury's verdict was for defendants.

After the verdict the court entered judgment as a matter of law in Carmouche's favor under Fed. R. Civ. P. 50(b) (1)(C), and conditionally awarded Carmouche a new trial in the event we should disagree with this disposition. See Fed. R. Civ. P. 50(c)(1). The magistrate judge believed that the three-month lapse between Taylor's letter to the Department of Labor and Carmouche's decision not to allow Taylor to return from leave was too great to support an inference that the former precipitated the latter. Given the rule that all evidence and inferences must be taken in the light most favorable to the verdict, this observation does not permit the court to set aside the jury's conclusion. Taylor went on leave soon after sending the letter, and Carmouche demanded medical clearance the very day she returned. The length of Taylor's maternity leave cannot preclude, as a matter of law, an inference that Carmouche imposed a penalty for criticism.

What does preclude the inference is the absence of any evidence that what Carmouche did was a penalty. Gary requires all employees returning from any health-related leave to provide medical evidence of fitness for duty. Carmouche did no more than enforce this rule. Whatever intentions or hopes Carmouche may have harbored, enforcing a policy applicable to all employees cannot reasonably be described as a penalty for speech. (No evidence of record implies that Carmouche enforced the rule selectively.) To find a

penalty, therefore, Taylor would have to point to the decision of January 1995, when Carmouche declined to allow her to work part time. But Taylor does not contend that the January 1995 decision was retaliation for her letter to the Department of Labor.

Although plaintiffs chastise the magistrate judge for removing from the jury's purview the decision whether the remaining grievances and protests dealt with matters of general public concern, their status is a question of law rather than fact, so the court rather than the jury is the proper decisionmaker. Connick, 461 U.S. at 148 n.7. Our review is plenary, id. at 150 n.10, and we agree with the magistrate judge's resolution. Three principal considerations persuade us that the magistrate judge was right in thinking these grievances covered by Connick.

First, as in Connick, all of the questioned speech took place within the employer's personnel hierarchy and concerned the management of the labor force. Smith and Taylor complained about Felton to Carmouche, and then to Carmouche's superiors. That Gary's personnel committee sometimes takes formal testimony rather than resolving grievances in other ways does not turn the subject from management to politics. In Connick itself the Court concluded that some of the speech concerned issues of public concern, but it held that the speech as a whole must be deemed work-related, in large measure because it all occurred within the workplace and concerned supervisory management styles--which is, in the end, pretty much what Smith and Taylor were complaining about.

Second, as in Connick and Waters, Smith and Taylor were protesting in their capacity as employees, not in their capacity as citizens. Their complaints related to their jobs. Taylor believes that she rather than Felton should have been promoted and that her leg injury should have been accommodated by allowing her to continue working on the third floor; Smith believes that she should have been allowed to hold surprise parties without interference, contends that her belated document delivery was someone else's fault, and believes that her supervisors used too much crude language. These are normal workplace grievances, and statements made in an employment setting about how the tasks should be carried out are appropriate subjects for reaction by management, without constitutional obstacles. Wales v. Board of Education, 120 F.3d 82, 84-85 (7th Cir. 1997). None of the statements was offered as a political view about what legal policies the City of Gary should adopt, or even as a view about the City's organizational

structure. Smith and Taylor were not engaged in a debate about whether it was desirable, say, for Gary to hire racists; they contended, rather, that race influenced what happened to them, on the job. None of the defendants' responses affected political discourse. As Justice O'Connor observed in Waters, 511 U.S. at 672-75 (some internal citations omitted):

> [E]ven many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees. The First Amendment demands a tolerance of "verbal tumult, discord, and even offensive utterance," as "necessary side effects of . . . the process of open debate," Cohen v. California, 403 U.S. 15, 24-25 (1971). But we have never expressed doubt that a government employer may bar its employees from using Mr. Cohen's offensive utterance to members of the public or to the people with whom they work. . . . [W]hen an employee counsels her co-workers to do their job in a way with which the public employer disagrees, her managers may tell her to stop, rather than relying on counterspeech. ... [T]hough a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing. Even something as close to the core of the First Amendment as participation in political campaigns may be prohibited to government employees. ...

> This does not, of course, show that the First Amendment should play no role in government employment decisions. Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished. ...

> . . . [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as

effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Carmouche and Felton acted in their capacity as supervisors of the Law Department rather than as regulators of private speech, which under Waters they may do without violating the first amendment.

Third, Smith and Taylor offered their assertion that Felton is a "racist"--the only statement that plaintiffs characterize as raising an issue of public concern--as a proposition of fact rather than of opinion, though it is principally the latter that the first amendment protects. Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974); Stevens v. Tillman, 855 F.2d 394, 398-402 (7th Cir. 1988). The statement at issue in Rankin v. McPherson, 483 U.S. 378 (1987), an employee's wish that the President be assassinated, asserted a political stance. But whether a given supervisor is a racist, or practices racial discrimination in the workplace, is a mundane issue of fact, litigated every day in federal court. "Felton is a racist" is defamatory, and a person who makes an unsupported defamatory statement may be penalized without offending the first amendment. Whether that penalty is delivered in a slander action, in a perjury prosecution, in an award of attorneys' fees for

making unsubstantiated allegations, or in the workplace by a suspension, is immaterial to the Constitution. What matters is that defamation of a co-worker may be punished, and as we pointed out in Feldman v. Ho, 171 F.3d 494, 497-98 (7th Cir. 1999), whether a particular defamatory statement is true or false is not a question of constitutional moment, unless the target is a "public figure," which Felton wasn't. See also Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-23 (1990); In re Palmisano, 70 F.3d 483 (7th Cir. 1995). The Court held in Waters that so long as the employer honestly and reasonably believes that workplace speech is inappropriate or disruptive, then the Constitution permits a response whether the speech in question was true or false, disruptive or not.

Smith and Taylor pressed their grievances through the machinery Gary provided to its employees. Sometimes they won; sometimes they lost. They were not entitled to take their losses to federal court and ask a jury to second-guess, in the name of the Constitution, the decisions of the personnel hierarchy.

Affirmed

Williams, Circuit Judge, dissenting.  I respectfully dissent. While I agree with the majority's resolution of Cynthia Taylor's claim relating to her reinstatement after her medical leave, I disagree with the majority's resolution of the plaintiffs' other claims. Specifically, I am not persuaded that the magistrate judge correctly ruled that the plaintiffs' protests within the City of Gary's chain of command did not deal with matters of public concern.

As I read the record, the plaintiffs' protests were an effort to challenge racism in the City's Law Department. In a variety of forums and on several occasions they raised their concerns about racism on the part of both Margaret Felton and Hamilton Carmouche. Most significantly, they went directly to both the City's Mayor and Deputy Mayor in their effort to speak out. And, there is no indication in the record that their protests were restricted to their individual concerns; rather, it appears that they were speaking out on behalf of the entire office. In light of these facts, I cannot conclude that the plaintiffs' protests regarding racism in the City's Law Department were simple workplace grievances that do not address matters of public concern. See generally Marshall v. Allen, 984 F.2d 787, 795-96 (7th Cir. 1993); Tindal v. Montgomery County Comm'n, 32 F.3d 1535, 1539-40 (11th Cir. 1994).

Assuming it is not related entirely to a private dispute between the plaintiff and defendant, racism in a public agency is inherently a matter of public concern. See Connick v. Myers, 461 U.S. 138, 148 n.8 (1983) (noting that racial discrimination is a matter inherently of public concern).

Moreover, that the plaintiffs' protests were communicated within the City's chain of command does not strike me as a particularly strong reason to deem their protests matters of private concern. The plaintiffs' should not be penalized for taking advantage of internal procedures for raising their concerns, instead of running to the press the first chance they had. See Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413-14 (1979) (expressing one's views privately rather than publicly does not forfeit the first amendment protections afforded a government employee); Hulbert v. Wilhelm, 120 F.3d 648, 654 (7th Cir. 1997) (noting that the plaintiff-employee was, if anything, to be commended for attempting to go through established internal channels).

As for the majority's suggestion that the plaintiffs' protests about racism in the Law Department were defamatory and therefore are not entitled to constitutional protection, I think the majority collapses two distinct areas of first amendment law. One area regards the limitations placed on a government when it acts in its sovereign capacity to penalize or authorize penalties for defamation. The other addresses the limitations placed on a government when it acts in its capacity as an employer to discipline one of its employees based on that employee's speech. In light of the distinct situations that must be addressed, quite different standards apply in these two areas. Whether defamation may be punished depends on whether the subject of the defamatory statement is a public official, public figure, or private figure, whether the defamatory statement involves a matter of public concern, and whether the defamatory statement is a proposition of fact. See generally Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985) (plurality opinion). Moreover, truth is an absolute defense. Whether a government employee may be disciplined for his or her speech depends on whether the speech addresses a matter of public concern and whether the government's interest in efficiency outweighs the employee's interest in speaking out. See generally Connick v. Myers, supra; Pickering v. Board of Education, 391 U.S. 563 (1968). Truth is not a defense. Collapsing these distinct standards confuses the

issues presented by this case. Contrast Waters v. Churchill, 511 U.S. 661, 671-75 (1994) (plurality opinion) (making a point of distinguishing the sorts of the first amendment restrictions placed on a government in its sovereign capacity and those placed on a government in its capacity as an employer). In fact, as this case is plainly governed by the law regarding employee speech, there is no need to discuss the law of defamation at all.