**Jenny WERNSING, Charles Bingaman and Troy Cannon, Plaintiffs,**

v.

**O'Dell THOMPSON, Jr., Department of Human Services of the State of Illinois, Sydney Roberts, Inspector General, Defendants.**

No. 01–1476.

United States District Court, C.D. Illinois.

Oct. 9, 2003.

Mary Lee Leahy, Leahy Law Offices, John Randall Cox, Feldman Wasser Draper & Benson, Springfield, IL, J. Brian Heller, Washington, IL, Richard Whitney,

Speir & Whitney, Carbondale, IL, for Plaintiffs.

Deborah Barnes, Karen McNaught, Terence Corrigan, Christine Ryan, Illinois Attorney General, Springfield, IL, for Defendants.

## ORDER

MIHM, District Judge.

This matter is before the Court on several motions for summary judgment. For the reasons set forth below, Wernsing's Motion for Partial Summary Judgment [# 36] is GRANTED. Bingaman[1] and Cannon's Motion for Partial Summary Judgment [# 41] is GRANTED, and Defendants' Motion for Summary Judgment [# 43] is GRANTED IN PART and DENIED IN PART.

### Factual and Procedural Background

Plaintiff, Jenny Wernsing ("Wernsing"), is an Internal Security Investigator II ("ISI 2") in the Inspector General's Office ("OIG") for the Department of Human Services ("DHS") of the State of Illinois. Plaintiffs Charles Bingaman ("Bingaman") and Troy Cannon ("Cannon") were also ISI 2s during the time relevant to this proceeding, although Bingaman also had other duties at various times. The OIG investigates reports of abuse and neglect toward mentally ill and developmentally disabled persons who receive services provided by the DHS. According to the job description, an ISI 2:

[P]erforms highly responsible, sensitive, and confidential investigative work; conducts the gathering and analysis of relevant facts and data concerning abuse and neglect investigations; completes investigations by preparing reports, sum-

marizing investigative activities and recommends conclusions to findings.

SPECIFICALLY:

1. Conducts confidential, sensitive, and complex investigations concerning reports of abuse and neglect at State-operated facilities and community agencies: gathers data and evidence, conducts interviews, receives reports and analyzes relevant evidence concerning cases of abuse and neglect; ensures that case reports are comprehensive and accurate; takes initial statements from staff.

2. Prepares written investigative reports upon the completion of the investigative process consisting of a summary of actions taken, findings, preservations of evidence and recommendation for corrective action and/or case closure.

3. Maintains confidential files pertaining to cases under investigation; ensures the security of all pertinent information gathered during the investigatory process.

4. Recommends revisions to investigatory procedures and practices.

5. Serves as an expert witness and provides testimony in criminal and administrative hearings related to the conducting of or results of the investigation.

6. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

In the fall of 2000, the OIG was organized as follows: The state was divided into four geographical Bureaus: the north (Chicago), the metro (the area surrounding Chicago), the central, and the south. Personnel statewide consisted of approximate-

---

1. The Court notes that Plaintiff Bingaman's name is spelled no less than three different ways in the pleadings of both parties. Accordingly, the proper spelling of his name is unclear, and the Court will use the spelling that appears on his personnel documents of record for purposes of this motion.

ly 31 ISI 2s, four to six team leaders, four Bureau Chiefs, the Deputy Inspector General, and the Inspector General, as well as various support personnel. ISI 2s reported to a team leader, who reported to the appropriate Bureau Chief, who reported to the Deputy Inspector General or to the Inspector General.

Defendant, Odell Thompson ("Thompson"), became the Inspector General of the DHS on July 1, 2000. On or about November 27, 2000, Thompson received an email from five employees in the OIG's Southern Bureau, including Wernsing, Bingaman, and Cannon. The email stated:

> Several investigators in the Southern Bureau have some concerns we wish to discuss with you as soon as possible. These concerns are relative as to who we understand you are going to appoint as the Southern Bureau Chief. These concerns are very important and need your attention before any appointment is made.

Thompson did not respond to the email. On November 30, 2000, Thompson received another email from the same five employees in the Southern Bureau, which stated in relevant part:

> We contacted you on 11/27/00 asking that you meet with us and discuss our serious concerns over who we understand to be the tentative selection for Bureau Chief. We have not heard from you. We once again ask that you meet with us. We would like if at all possible to keep this matter in house out of respect for the chain of command and in keeping with respect for your position. However, if we are not afforded this opportunity we will feel compelled to air our concerns to the Secretary or those at the legislative level.

Again, Thompson did not respond to the request for a meeting with the five signatories and made no inquiries into the basis for the email.

The espoused concerns apparently stemmed from the fact that Wernsing had heard that Thompson was going to appoint Ron Fuentes ("Fuentes") as Bureau Chief over the Southern Bureau. Each of the signatories had worked with Fuentes when he had previously served as Bureau Chief, and had concerns about a backlog in cases and other acts of alleged mismanagement that had developed during his tenure.

On or about December 5, 2000, Thompson sent a letter to the five signatories that stated in relevant part:

> The Office of Inspector General staff are not authorized to communicate about Office of Inspector General policies or operations directly to the Secretary [head of the DHS], to the press, or to any external agent except with my prior knowledge and approval.

This admonition was repeated in a second communication that was sent to all employees in the OIG in January 2001.

Wernsing understood these directives to mean that she could not talk to anyone about anything to do with OIG. She then asked her supervisor, Sandy Mott ("Mott") if the directives applied to conversations that she might have with her union representative, an attorney, or her legislator. On January 26, 2001, Mott sent an email to the Inspector General's Office relaying the question. Defendant Sydney Roberts ("Roberts"), who was at that time Deputy Inspector General, responded with two email messages. The first read "Your people really want to try me don't they." The second email from Roberts stated:

> No one in the OIG is represented by a Union that is in any sort of contractual agreement with DHS. Thus we don't have to honor anything that their union representative requests unless it is consistent with the rights all employees are entitled to by state or federal law. In other words, they follow the direction of

their union representative at their own peril.

With respect to the statements made to union personnel, the courts have said that employers may regulate the speech of *certain employees in certain circumstances.* Thus, they should know the law on this matter, before discussing OIG matters with outside individuals.

(Italics in original.) On February 7, 2001, Mott emailed Wernsing with the following response:

In answer to your question, Deputy I.G. Sydney Roberts indicated to me that no one in the OIG is represented by a Union that has a contractual agreement with DHS. Thus, we don't have to honor anything that their union representative requests unless it is consistent with the rights all employees are entitled to by state or federal law. Further, with respect to statements made to union personnel, the courts have said that employer may regulate the speech of certain employees in certain circumstances. Thus, you should know the law on this matter before discussing OIG matters with outside individuals.

Thompson testified that there was nothing other than the two emails from Wernsing, et al., that caused him to issue the directives and that his concern was that he "didn't want to be sabotaged in some way or some manner" because he "just didn't know what their motives were." He also admitted that he didn't make any effort to determine what the motives of the five signatories to the emails were in suggesting communications with the Secretary of DHS or legislators and that the release of confidential information by OIG employees and contacts with the press were already covered by both statute and DHS rules. Thompson also indicated in a meeting with Bingaman in Spring 2001 that he believed that contacting a legislator about him would have been a violation of his di-

rectives. On August 3, 2001, Wernsing brought this suit alleging that the above directives constitute a prior restraint on speech that infringes on her First and Fourteenth Amendment rights, as well as First Amendment retaliation. Bingaman and Cannon were subsequently added as Plaintiffs. The parties have now filed motions for summary judgment, which are fully briefed and ready for resolution. This Order follows.

## Standards for Summary Judgment

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue

for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

## Discussion

### I. *Prior Restraint*

The Plaintiffs argue that Thompson's December 2001 and January 2002 directives constitute a prior restraint on speech, as they prohibit all OIG staff from communicating about OIG policies or operations to the Secretary of DHS, the press, or any "external agent" without prior approval from Thompson. Specifically, they contend that the directives restrict a certain type of speech, vest absolute discretion in the Inspector General as the reviewing body by authorizing judgment about the content of any proposed speech or other expressive activity, place no constraints upon the review process, refer to no appeals process, and present the likelihood of self-censorship by eliminating the possibility of anonymous speech.

Individuals do not forfeit their First Amendment rights merely by virtue of the fact that they accept employment with a governmental unit or agency. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). However, it is equally well-settled that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. NTEU,* 513 U.S. 454, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995). In evaluating the constitutional propriety of a restraint on government employee speech, courts must attempt to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 88 S.Ct. at 1734–35, 88 S.Ct. 1731; *Wainscott v. Henry,* 315 F.3d 844, 848 (7th Cir.2003). Where a ban "chills potential speech before it happens ... the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU,* 115 S.Ct. at 1014, 115 S.Ct. 1003.

Plaintiffs contend that Thompson's directives operate as a prior restraint on speech. It is well-established that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *CBS v. Davis,* 510 U.S. 1315, 114 S.Ct. 912, 914, 127 L.Ed.2d 358 (1994). While the presumption against prior restraints "is by no means absolute, the gagging of publication has been considered acceptable only in 'exceptional cases.'" *Id., citing Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). As the Supreme Court recognized in *Davis:*

> Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remed[y]" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.

114 S.Ct. at 914. The elements of a prior restraint are:

> (1) the speaker must apply to the decisionmaker before engaging in the pro-

posed communication; (2) the decision-maker is empowered to determine whether the applicant should be granted permission based on his/her review of the proposed content of the communication; (3) approval of the request requires affirmative action by the decision-maker; and (4) approval is not a matter of routine, but involves the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the decision-maker.

*Crue v. Aiken,* 204 F.Supp.2d 1130, 1137 (C.D.Ill.2002), *citing Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 554, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

█ Here, the directives on their face ban all speech on OIG policies and operations without prior permission from Thompson, which is at least to some degree content-based. It also seems clear that the directive "chills potential speech instead of merely punishing actual speech already communicated" and imposes a "blanket policy designed to restrict expression by a large number of potential speakers." *Milwaukee Police Assn. v. Jones,* 192 F.3d 742, 750 (7th Cir.1999); *Harman v. City of New York,* 140 F.3d 111, 118 (2nd Cir.1998). Thus, they would appear to operate as prior restraints even under the Seventh Circuit's most recent pronouncements in *MacDonald v. City of Chicago,* 243 F.3d 1021, 1032–36 (7th Cir. 2001), and *Thomas v. Chicago Park District,* 227 F.3d 921 (7th Cir.2000), as the directives on their face reduce certain categories of speech, vest more than considerable discretion in Thompson as the reviewing body, place no time constraints upon

the review process that prevent the proposed commentary from becoming moot by delay, refer to no appeals process, and present the likelihood of self-censorship by eliminating the possibility of anonymous speech that may discourage potential speakers from coming forward. Under the guidance of these cases, the Court finds that Thompson's directives trigger the *NTEU* standard. *Milwaukee Police Assn.,* 192 F.3d at 749–50.[2]

█ The first step in applying this standard is to determine whether the speech at issue is a matter of public concern, for when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In determining whether the speech is a matter of public concern, the content, form, context, and motivation of the speech must be considered, with content being the most important factor. *Horwitz v. Board of Education of Avoca School District No. 37,* 260 F.3d 602, 618 (7th Cir.2001), *citing Button v. Kibby–Brown,* 146 F.3d 526, 529 (7th Cir.1998); *Connick,* 103 S.Ct. at 1690.

█ Here, the facial content of Plaintiffs' emails is essentially undisputed, as the emails in question are of record. On their face, the text of the emails express the writers' desire to communicate unspecified concerns over who they thought was

2. Defendants cite *Messman v. Helmke,* 133 F.3d 1042, 1047 (7th Cir.1998), for the proposition that the high level of scrutiny employed in *NTEU* is not applicable to lesser restrictions on speech or association. While the Court agrees with this assertion in principle, it is inapposite here as the restriction in this case is a blanket restriction on speech appli-

cable to all OIG staff, is not closely related to the legitimate harms that Thompson purportedly sought to avoid, operates to cut off many, if not all, venues for employees to voice their concerns and is therefore materially distinguishable from the lesser restriction in *Messman.*

going to be appointed as the Bureau Chief for the Southern Bureau and stress that the concerns are "very important" and "serious" without further elaboration. Wernsing and the other signatories have testified that their concerns were based on their knowledge of Fuentes' poor performance during his prior tenure as Bureau Chief. Specifically, they feared that Fuentes' appointment would result in a return to a substantial case backlog (such as one that caused over a year's delay in the investigation of a death) and missing confidential files (which were subsequently found in the trunk of his car) that occurred during Fuentes' previous appointment.

Thompson contends that this case is analogous to *Taylor v. Carmouche,* 214 F.3d 788 (7th Cir.2000), in which the Court of Appeals found criticism of an appointed supervisor to be a purely personal concern as employees and therefore unprotected. In *Taylor,* a lawyer and secretary deemed the newly appointed city attorney a "racist" and complained that she was a stern taskmaster, condescending, insensitive, and touchy. *Id.* at 790–91. These are clearly personal complaints going to the plaintiffs' relationship with the new city attorney as employees rather than any concern by them as citizens to prevent official misconduct. Such is not the case here, where there was a prior restraint on speech, and the speech involved an effort by employees to bring to light claims of actual mismanagement and gross negligence in the conduct of OIG business by Fuentes, which had placed the recipients of DHS services in physical danger during his tenure due to seriously delayed investigations. This is not merely speech on internal personnel matters, but rather addresses a more far reaching issue of public concern. Although the emails were vague and lacking in specific details, the text of the emails can reasonably be read to support Plaintiffs' asserted public purpose in speaking, as well as the contention that their complaints were motivated by considerations of public safety and the welfare of the mentally ill and developmentally disabled persons receiving DHS services who did not receive adequate protection during Fuentes' alleged mismanagement of the Southern Bureau.

Additionally, Wernsing has stated that the directives have chilled her from several specific types of speech, namely: (1) responding to inquiries about OIG policies from persons working at community facilities; (2) commenting publicly on recent changes to Administrative Rule 50, which governs investigations of alleged abuse or neglect in state-operated facilities; and (3) commenting on the fact that the OIG was going to delegate investigations of serious injuries at community health centers to the facilities themselves. Thompson argues that this assertion contradicts her deposition testimony, in which she responded to a question about who she wanted to speak to by stating "there wasn't anything *at that point* except for my union rep with my grievance." (Emphasis added.) In this respect, Wernsing is now clarifying that while there wasn't initially other communication that she had in mind, she was chilled from speaking out on other topics that arose as time went on under Thompson's tenure. For example, Wernsing inquired about talking to her union representative in January 2001, while the record indicates that Thompson issued a document containing the changes to Administrative Rule 50 in May 2002. Accordingly, the Court disagrees that the assertions contained in Wernsing's affidavit were inconsistent with her deposition testimony.

This would qualify as speech on a matter of public concern, because an "employee's ability to highlight . . . breaches of public trust is a critical weapon in the fight against governmental corruption and inef-

ficiency." *Wainscott*, 315 F.3d at 849. Defendants do not make any real effort to argue otherwise, making only the casual comment that no message of public concern was actually conveyed in the emails. However, this misses the point, because it ignores the context of the communications. The essence of a prior restraint is that it preempts or chills communications that have not yet happened, such as the comments that Plaintiffs desired to make to the DHS Secretary or their legislators after Thompson declined to give them an audience.

Having found the speech to be of public concern, the Court must next "balance the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the State, as an employer, in promoting effective and efficient public service." *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731. Defendants bear the burden of demonstrating that its interests outweigh not only the interests of the Plaintiffs in speaking, but also the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression.

Plaintiffs argue that the balance of interests weighs against Thompson's directives, as "[t]he general public and the legislature ... have a strong interest in hearing from OIG employees regarding the failures of the OIG to faithfully carry out its duty to see that the most vulnerable among us are not abused." Plaintiffs clearly have an interest in exposing mismanagement or poor performance by the individuals charged with investigating and protecting the rights of the mentally or physically disabled, and the public has a substantial interest in receiving this type of information. The question then becomes what interests Thompson was attempting to serve by imposing the restriction on their speech.

It is not difficult to see that the OIG would have a substantial interest in protecting the confidentiality of its investigations. However, the confidentiality of these investigations is already mandated by Illinois statute (e.g., 740 ILCS 110/1 et seq.) and other OIG policies. "[W]here the government singles out expressive activity for special regulation to address anticipated harms, the government must 'demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" *Harman*, 140 F.3d at 121. This point is well taken, as there has been no evidence of harm to date, such as incidents in which employees have previously released confidential information from OIG investigations. Nor has there even been evidence that employees were likely going to release confidential information from their investigations.

Moreover, neither the directives implemented in this case nor the clarifying statements that were subsequently made to the Plaintiffs are remotely tailored to serve the asserted interest in a direct or material way and are overbroad in that they go far beyond any legitimate interest Thompson may have had in assuring the confidentiality of OIG investigations. On their face, the directives bar all communications regarding OIG policies or operations to any "external agent", which Thompson subsequently defined as any individual who was not privy to information relating to an ongoing or closed investigation. Moreover, the facially unrestricted scope of the directives actually purports to limit even communications that are expressly protected by other Illinois statutes, specifically the disclosure of mismanagement, abuse of authority, criminal misconduct, and other similar communications that are protected by the Whistleblower Protection Act and Personnel Code.

Thompson conceded in his deposition that he made no attempt to find out what the concerns of the Plaintiffs and the other signatories to the email were prior to issuing the directive. He further stated that he really had no idea where they were coming from or what they wanted to talk about. There is nothing in the record to suggest that Thompson had any reason to believe that Plaintiffs' proposed communications had anything to do with confidential information from OIG investigations. Despite Thompson's best efforts to recharacterize the scope of the directives in his summary judgment briefs, he has yet to articulate what real and nonconjectural harms he was trying to prevent by suppressing speech and further admitted that his rationale for issuing the directives was that he was new to the position, knew about litigation that had been going on regarding another appointment in the OIG, and "didn't want to be sabotaged in some way or some manner" because he "just didn't know what their motives were." Thompson has also indicated that, in his opinion, an employee contacting a legislator about him would violate the directive, which suggests that his motive was not assuring that OIG investigations remain confidential as required by Illinois statute.

Thus, the only asserted rationale for implementing the directives that a reasonable jury could find to be supported by the record was Thompson's personal concern to avoid being "sabotaged", rather than any purported interest in improving the efficient provision of public services or protecting the confidentiality of the investigative process. Such a concern is clearly outweighed by Plaintiff's interest in speaking out on a matter involving alleged administrative incompetence that could ultimately implicate the public safety. Thompson has simply failed to carry his burden of demonstrating that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by any 'necessary impact on the actual operation' of the Government that Plaintiffs' proposed speech may have had. Plaintiffs' speech was therefore entitled to constitutional protection.

■■■■■ Thompson argues that he is protected by the so-called "policymaker" exception set forth in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), based on the contention that Plaintiffs were policymakers or confidential employees, and cites precedent to the effect that a public employer may discharge a policymaking or confidential employee who publicly takes a position inconsistent with that of his employer. However, as the Court previously stated at the motion to dismiss stage of this litigation, the precedent cited involves disciplinary action taken after the speech in question had occurred and does not establish that the "policymaker" exception (even assuming its applicability in this case) applies in the same manner to cases involving prior restraints on speech, where preclearance requirements may have a broad inhibiting effect on all employees by causing "self-censorship by speakers in order to avoid being denied a license to speak." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

Whether the "policymaker/confidential employee" exception is applicable in the context of a prior restraint on speech appears to be an issue of first impression. Nevertheless, even assuming arguendo that the exception can be extended to apply under the facts of this case, and making the highly improbable assumption that Plaintiffs are in fact "confidential employees" or "policymakers" within the mean-

ing of the exception,[3] Thompson has shown only that Plaintiffs had access to confidential files, had a preexisting duty to maintain the confidentiality of their investigations pursuant to statute and DHS regulations, and that Thompson was afraid that they might sabotage him by breaching confidence. The record reveals no legitimate basis for his presumption that their speech involved the OIG's confidential investigations, would constitute a breach of confidentiality, or amounted to interference from disloyal employees. Furthermore, it is well-settled in this circuit that an employee's access to confidential information and an employer's fear that the employee will possibly breach confidence is insufficient to satisfy the policymaker exception as a matter of law. *Matlock v. Barnes*, 932 F.2d 658, 663 (7th Cir.1991), *citing Meeks v. Grimes*, 779 F.2d 417, 421 (7th Cir.1985). Thompson has therefore failed to meet his burden of justifying the restriction pursuant to the policymaker exception.

## II. *Retaliation*

■■■■ Thompson also moves for summary judgment on Plaintiffs' § 1983 retaliation claim. Section 1983 creates a federal cause of action for the "deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and the laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). It is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere. *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The initial step in any § 1983 analysis is to identify the specific constitutional right which was allegedly violated. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Here, Plaintiffs

claim that they were retaliated against for having exercised their First Amendment rights by sending the emails to Thompson.

■■■■ "It is well established that '[a]n act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution.'" *Abrams v. Walker*, 307 F.3d 650, 654 (7th Cir.2002), *citing DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir.2000). In order to establish a prima facie case of First Amendment retaliation, a plaintiff must establish that: (1) his or her conduct was constitutionally protected, and (2) that his or her conduct was a "substantial factor" or "motivating factor" in the defendant's challenged actions. *Id.* The Seventh Circuit has further held "that even if a defendant was 'brimming over with unconstitutional wrath' against a § 1983 plaintiff, that plaintiff cannot prevail unless he or she establishes that the challenged action would not have occurred 'but for' the constitutionally protected conduct." *Id., citing Button v. Harden*, 814 F.2d 382, 383 (7th Cir.1987). If the plaintiff can make this showing, the burden then shifts to the defendant to show that he would have taken the same actions even absent the protected conduct. *Id.*

■■■ Here, Plaintiffs allege acts of retaliation including not only the prior restraint of their speech contained in the directives, but also: (1) an incident when Thompson yelled at Wernsing and threatened her with termination after she inquired about the definition of "external agent" contained in the directives; (2) Thompson's denial of overtime pay and mileage to Wernsing and Bingaman after the requests had been approved by their immediate supervisor and the Bureau Chief; (3) Wernsing was warned by the Bureau Chief to watch out because Thompson was watching everything that

---

**3.** *See Thornburg v. Peters,* 155 F.Supp.2d 984 (C.D.Ill.2001).

she did; (4) the downgrading of Wernsing and Bingaman's annual performance evaluations following the emails; (5) the introduction of false and misleading evidence at Bingaman's grievance hearing; (6) the denial of Bingaman's application for the position of Southern Bureau Chief; (7) the denial of appropriate/customary travel and lodging expenses for both Wernsing and Bingaman on different occasions; and (8) Thompson's denial of an approved salary differential for the time when Bingaman served as acting Investigative Team Leader.

The Court has previously found that Plaintiffs' attempt to communicate with Thompson on matters going to the competency and efficiency of the OIG and revealing past instances of mismanagement that arguably impacted public safety were matters of public concern and that Plaintiffs' interest in communicating this information outweighed any legitimate interest Thompson may have had in preventing the communication, as he made no effort to determine the nature of Plaintiffs' speech before implementing fatally overbroad directives that were not materially related to the subject of the proposed speech. Thus, the Court has found that Plaintiffs' speech was entitled to constitutional protection. When the record is viewed in the light most favorable to Plaintiffs as the nonmoving parties, as the Court must at this stage of the litigation, they have demonstrated for purposes of this motion that their speech was a substantial or motivating factor in Thompson's issuance of the directives, as Thompson admitted in his deposition that there was nothing other than Plaintiffs' emails that caused him to draft and sent out his directives. They have also met their burden of showing a qualitative change in the terms and conditions of their employment for purposes of resolving this Motion. *See Johnson v. Cambridge Industries, Inc.,* 325 F.3d 892, 901 (7th Cir.2003).

Accordingly, the burden shifts to Thompson to establish that he would have taken the same actions but for Plaintiffs' speech. In this respect, the Court finds a genuine issue of material fact that remains for trial. While Thompson has introduced evidence suggesting that his actions were motivated by other considerations, Plaintiffs' have introduced the testimony of Mott that Thompson called her in response to Plaintiffs' emails and threatened consequences if the signatories contacted any legislators and remarked that he "could play that game." Mott also testified that Thompson expressed his anger at Wernsing to her, yelling, "What is it with you people; I'm tired of these games; I am angry." Mott indicated that after she had completed evaluations for Wernsing and Bingaman following their emails to Thompson, Thompson changed the policy on evaluations so that he could play a more active role and implemented criteria that required her to downgrade Plaintiffs in part for their role in sending the emails. After Mott served as Bingaman's technical advisor at his grievance hearing, she was suspended even though she was under a subpoena to appear at the hearing. Mott further testified that Bingaman was the only acting investigative team leader who was not promoted to Bureau Chief but was actually demoted to an investigator's position, and she was informed by the DHS personnel director that she was appointed to Southern Bureau Chief in order to deny the position to Bingaman. A reasonable jury could find that Mott's testimony links Thompson's alleged retaliatory acts to Plaintiffs' speech, providing a sufficient nexus between the protected activity and Thompson's actions to survive summary judgment.

There are other examples of evidence in the record on both sides of this question. However, the Court need not address every possible example, as it is clear that

there is a genuine issue of material fact requiring resolution by a jury and precluding the entry of summary judgment in favor of Thompson on Plaintiffs' retaliation claim.

### III. *Qualified Immunity*

 Thompson also argues that he is entitled to qualified immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the United States Supreme Court enunciated the "modern standard to be applied in qualified immunity cases." *Auriemma v. Rice*, 895 F.2d 338, 341 (7th Cir.1990). The Court stated:

Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. The test for qualified immunity is "whether the law was clear in relation to the specific facts confronting the public official when [he or she] acted." *Green v. Carlson*, 826 F.2d 647, 649 (7th Cir.1987). In deciding whether a defendant will enjoy qualified immunity, courts must determine: "(1) whether the plaintiff has asserted a violation of a federal right, and (2) whether the constitutional standards implicated were clearly established at the time in question." *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir.1995), *citing Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir.1994). The first issue is a threshold one. If the plaintiff fails to state a violation of a federal right, then the plaintiff's claim fails altogether and the court need not go on to decide whether the law was clearly established at the time of the offense. *See Marshall v. Allen*, 984 F.2d 787, 793 (7th Cir.1993); *Zorzi v. County of Putnam*, 30 F.3d 885, 892 (7th Cir.1994); *Eversole*, 59 F.3d at 717. In outlining the approach a court must take in addressing qualified immunity, the Seventh Circuit has advised:

Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

*Landstrom v. Ill. Dept. of Children & Family Serv.*, 892 F.2d 670, 675 (7th Cir. 1990), *quoting Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

 Based on the record before the Court, Plaintiffs have established that Thompson's directives operated as a prior restraint in violation of their First Amendment right to freedom of speech and have survived summary judgment on their retaliation claim. The question then becomes whether their right to be free from such a restriction was clearly established on December 5, 2000, when the first directive was issued. The Court notes that long before Thompson issued his directive, the Supreme Court had held that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Davis*, 114 S.Ct. at 914; *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). In fact, it was equally well-established that prior restraints, often referred to as a "most extraordinary remed[y]", have been upheld "only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." *Davis*, 114 S.Ct. at 914.

More specifically on the issue of First Amendment retaliation, the Seventh Circuit has held:

It was ... clear in June 1996 that government employees had a First Amendment right to speak on matters of public concern that must be weighed against the employer's right to punish insubordination. [The employer] cannot claim not to have known that disciplining [the employee] under these circumstances would not implicate her right to free speech.

*Myers v. Hasara,* 226 F.3d 821, 829 (7th Cir.2000). Thus, it was clearly established prior to December 2000 that if Plaintiffs wanted to speak on a matter of public concern, and their interests in doing so outweighed any of Thompson's legitimate interests, precluding their speech without substantial justification and retaliating against them for that speech would be illegal.

Thompson has made no showing that the proposed speech presented a likelihood of imminent lawless action or that the speech would have materially and substantially interfered with the requirements of appropriate discipline in the operation of the OIG. To the contrary, all that has been demonstrated is Thompson's subjective belief that the proposed speech might be an attempt to somehow sabotage his appointment. This is plainly insufficient to justify the broad prior restraint on speech imposed by the directives under the precedent cited above, and it should have been apparent to a reasonable official that attempting to enforce the directives against Plaintiffs or other OIG employees would violate their constitutional rights.

Thompson suggests that Plaintiffs must cite to cases with very similar facts in order to overcome qualified immunity and note a lack of authoritative cases finding similar conduct to be unlawful in factually similar circumstances. However, this is a somewhat inaccurate articulation of how qualified immunity operates. In *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2515,

153 L.Ed.2d 666 (2002), the Supreme Court stated:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful...."

The Court went on to note that a "fundamentally similar" or "materially similar" factual situation is not required in order for a right to have been "clearly established"; rather, the state of the law must only be such as to give a defendant "reasonable" and "fair" warning that his conduct would deprive an individual of a constitutional right. *Id.* The Court further cited to its 1997 decision in *United States v. Lanier,* 520 U.S. 259, 270–71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), in noting that "general statements of the law are not inherently incapable of giving fair and clear warning" and "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" In other words, although the unlawfulness of the conduct in question must be apparent in the light of pre-existing law, there is in fact no requirement that a plaintiff cite to cases with "very similar" facts, as suggested by Thompson, and an "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope,* 122 S.Ct. at 2516.

As the above-cited case law was in existence prior to December 2000 and was sufficient to give Thompson fair warning that his prior restraint of Plaintiffs' speech was unconstitutional, the Court finds that

Thompson's issuance of the directives violated clearly established statutory or constitutional rights of which a reasonable person would have known and is therefore not exempt from suit under the doctrine of qualified immunity. Likewise, as it has been clearly established since 1996 that retaliation for the exercise of First Amendment rights would be unlawful, and Plaintiffs have raised a genuine issue of material fact requiring resolution by a jury as to whether Thompson acted in retaliation for their speech, Defendant Thompson is not entitled to qualified immunity on this claim as well.

### IV. *Continuing Violation*

Defendants argue that Plaintiffs have made no attempt to establish that they are being subjected to a continuing violation of federal law, as the directives were issued by Thompson, and he is no longer the Inspector General. In *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Supreme Court held that voluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." The rationale for this is that in the absence of such a rule, a defendant could voluntarily cease the challenged conduct in order to moot the lawsuit, and then immediately "return to his old ways" once the coast was clear. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Defendants bear a heavy burden in making this showing that the matter is moot. *Id.* at 633, 73 S.Ct. 894.

Defendants have now submitted the sworn affidavit of Roberts, who suc-ceeded Thompson as the Inspector General in February 2003. In her affidavit, Roberts states:

> Confidential issues relating to the Office of the Inspector General are covered by statutes and the Illinois Administrative Code. The employee handbook promulgated by the Department of Human Services of the State of Illinois contains provisions relating to media contacts and legislative inquiries. Affiant has not issued any directives dealing with the issue of confidentiality of agency operations. I am familiar with the allegations contained in the matter entitled Wernsing v. Thompson, No. 01–3237 (USDC C.D.Ill.). I have reviewed the letter sent by Odell Thompson to the plaintiffs and I have reviewed the January 2001 newsletter which is at issue in the case. I have sent no letters or newsletters to any employee of DHS which contains the language which is at issue in that case, and I have taken no action as to any employee based on the newsletter. I do not consider the above referenced letter and newsletter to be the official policy of the Office of the Inspector General.

(Roberts Affidavit, ¶¶ 3–6.) Although this is not the clearest disavowal of the continued viability of Thompson's directives, the Court does find Roberts' uncontroverted affidavit marginally adequate to establish that she does not consider the directives to be in force under her tenure as Inspector General and that there is not a substantial likelihood of future enforcement or reinstatement of Thompson's directives. As Defendants have sufficiently demonstrated that the policy from which Plaintiffs sought relief no longer exists and that the illegal prior restraint of speech at issue in this case cannot reasonably be expected to

**1002**

reoccur, the claim for injunctive relief is effectively moot, as there is no need to enjoin prospective action that would violate federal law. The exception of *Ex Parte Young*, therefore, does not apply to lift the bar of sovereign immunity otherwise imposed by the Eleventh Amendment against claims that are effectively against the State of Illinois, and Defendants are entitled to judgment in their favor on this aspect of Plaintiffs' Complaint. As Roberts was only named as a Defendant for purposes of injunctive relief, she is no longer a necessary party to this litigation and is hereby dismissed.

### Conclusion

For the reasons set forth above, the Motions for Partial Summary Judgment [# 36 & # 41] by Wernsing, Bingaman, and Cannon are GRANTED in that the Court finds as a matter of law that their speech was entitled to constitutional protection and that Thompson's directives operated as an unlawful prior restraint. Defendants' Motion for Summary Judgment [# 43] is GRANTED IN PART and DENIED IN PART. Defendant Roberts is hereby TERMINATED as a party in this matter. The final pretrial conference remains set as previously scheduled for 11:00 a.m. on October 30, 2003, in person in Peoria.